## THE SHADY SIDE.

### THE HENRY U. PALMER.

(District Court, S. D. New York. March 31, 1899.)

COLLISION — NAVIGATING NEAR PIERS—MAKING LANDING—CROSSING BOWS — DAMAGES DIVIDED.

> Where, in a collision between a tug and car float and a steamer, while attempting to turn and make a landing at her pier, the tug and float were pursuing a course close to the piers, instead of as near the center of the river as possible, as required by statute, and the steamer attempted to make the turn ahead of the tug at a dangerous rate of speed, exceeding that permitted by statute in such river, and without having received any answer to her signal to the tug, both vessels were guilty of negligent navigation, and hence the damages should be divided.

In Admiralty. Collision.

James J. Macklin, for the Shady Side.
Carpenter & Park, for the Henry U. Palmer.

BROWN, District Judge. The above libel and cross libel were filed to recover the damages growing out of a collision between a car float going up the East river near the New York shore, in the ebb tide, in tow on the port side of the tug Henry U. Palmer, at about 10:45 a. m. of April 5, 1898, and the passenger and freight side-wheel steamer Shady Side, while the latter, coming on a trip from Stamford, was rounding to make her regular landing at the Pike street pier, New York.

The car float was 226 feet long by 36 feet wide, and her bow ran ahead of the Palmer's bow 110 feet. The Shady Side was 175 feet long, and made regular daily trips between Stamford and New York, arriving here very regularly between half past 10 and a quarter of 11. Her speed was about 13 or 14 miles per hour including the tide, which was about 2½ knots, and the float was making probably about 4½ miles per hour against the tide.

The width of the river between Pike street and Catherine ferry, measured from pier to pier, is about 1,300 feet. The Shady Side by going within 150 feet of the Brooklyn shore can round to against the ebb tide and make her turn of a half circle so as to head up river about 150 feet off the New York piers; that is, in a diameter of about 1,000 feet, keeping nearly at full speed with her wheel hard a-port. This under the drag of her rudder would be at the rate of about 11 miles per hour. Her rounding on this occasion was in the usual manner; namely, by porting her wheel when off the coal yard a little above Catherine ferry on the Brooklyn shore, and reducing to "half speed" until the wheel is got hard a-port, and then resuming and keeping full speed until near the New York shore. The collision occurred when she was one or two piers below Pike street, and lacking two or three points of being headed up river, her bow being from 150 to 200 feet off the New York piers. Her port quarter and paddle box were struck by the starboard corner of the float. The Shady Side did not stop or reverse her engines until a few seconds before the collision, nor did the tug reverse until within about 30 feet of the steamer.

Soon after the Shady Side began to turn under her port wheel, and when 150 or 200 feet from the Brooklyn shore, a signal of one whistle was given to the tug and tow, which were then about 1,000 feet distant near the Catherine street ferry on the New York side, or a little below. The captain of the tug had previously noticed the Shady Side when she was off Adams street. He testifies that he heard her whistle when she was off the upper pier of Catherine ferry, Brooklyn, but "as she was headed straight down river he supposed the signal was for some other vessel." On looking around and seeing no other vessel, he concluded that this signal was for himself, and thereupon he says he gave a signal of two whistles followed by an alarm signal, deeming it impossible for the Shady Side to go ahead of him. At the time this signal was given, he says the Shady Side had turned so as to head straight across the river and was then opposite the Empire Stores, a pier below Catherine ferry. He says the Shady Side replied with two whistles and an alarm (the Shady Side says it was one whistle and an alarm), whereupon he again blew an alarm signal and ordered his engines reversed. The Shady Side, he says, was about 400 feet distant from him at his first signal and was pointing for the float; and at the second alarm, about 10 seconds afterwards, he says the Shady Side was about 100 feet from him and about 20 feet below the bow of the float. The mate, who was also a pilot and assisting at the wheel in the pilot house, says that at the second alarm she was about 50 feet distant and a little below the bow of the float. The report made to the local inspectors by the captain of the tug on the day following the collision, does not agree with his testimony at the trial. In that report he says he was about 150 feet from the New York shore; and he puts the Shady Side at her first signal of one whistle heading about 1½ points towards the New York shore, showing she was in the act of rounding to; and as this agrees with the Shady Side's testi-

mony, I have no doubt that was her heading at that signal, and not straight down; and there would have been no difficulty in making her landing without accident had the tug given way by stopping or reversing when the first signal was heard.

The interval from the time when the Shady Side ported her wheel a little above Catherine street to the collision, going at a speed of 11 or 12 miles per hour, could not have exceeded $1\frac{1}{2}$ or 2 minutes. In a strong tide in order to make a turn of half a circle in so narrow a space, it was necessary that she should maintain a fair speed, though not such high speed, in order to keep under full command and to avoid accidents with other vessels; and she could not maneuver while making such a turn without evident embarrassment. The position of the tug and float close to the New York shore, was in violation of the state statute, which requires vessels to navigate in the middle of the river as near as may be; and in this case the tug's position was evidently an embarrassment to the Shady Side in conveniently making her regular landing. Had the float been near mid-river, as the statute requires, the Shady Side could have rounded to either ahead of the tug, if the tug was sufficiently below her, or if not, then under the stern of the tug and float, and come up on a curve to the westward between the float and the New York shore, which the Shady Side could not do when the tug was navigating near the shore. The master of the tug recognized the Shady Side when he first saw her; he knew her habit of rounding and her place of landing. In the position which he had voluntarily taken close to the New York shore, contrary to the statutory requirement, it was his duty, on hearing the signal of the Shady Side indicating that she was about to turn to go to her landing, to give way at once, and to check his speed as might be necessary. It is evident from his own testimony that at least a minute must have elapsed before he checked his speed at all, as he says that was after he had given his first alarm, which was given when the Shady Side was in mid-stream and was heading straight across. I credit the statement of the officers of the Shady Side that they gave no signal of two whistles, but when in mid-stream did repeat the signal of one whistle, followed by an alarm signal. I cannot credit the statement of the witnesses for the tug that the Shady Side, when in mid-stream, was below the bows of the float. That does not agree with the Shady Side's testimony; and on computation of the necessary turn that the Shady Side must have made in rounding so as to reach Pike street landing, making all allowances for her drifting with the tide at the rate of $2\frac{1}{2}$ knots, I cannot bring her so far down stream as the bow of the float must have been when the Shady Side was heading straight across. In turning six points afterwards, she would not have moved up river against the tide over 150 feet, and the tug must have come nearly twice that distance below the point of collision.

Notwithstanding the primary duty resting on the tug in navigating near the shore, to give way to the Shady Side while rounding for her landing, and the consequent fault of the tug, I think

the Shady Side is also to blame both for dangerous navigation in rounding ahead of the tug in so narrow a space at such high speed (which was above the 10 miles allowed by statute in the East river), and also for proceeding as far as to mid-river at such speed, and so near to the float as she must have been at that time, without first obtaining any answering or assenting signal from the tug. At that time they were not more than about 500 feet apart, and the Shady Side was heading but little above the tug and very rapidly approaching her path; so that it is doubtful whether collision could have been then avoided by any acts that either or both of them could thereafter have done, considering the speed at which both were then going. That is in fact the excuse the pilot of the Shady Side gives for not reversing at that time. He had no right, however, to run into such a position, at such speed and crossing the tug's bows, without an assenting signal. From the position in which the tug was previously seen to be, the pilot of the Shady Side must have perceived that he could not round to and make his landing unless the tug should give way by stopping or reversing; and although he might naturally expect her to do so, he had no right to run into a position where collision was unavoidable before receiving an answering signal promising that concession.

The damages and costs should, therefore, be divided.